ATLANTIC GIANT POWDER CO. v. TOWNSEND. See Case No. 623.

---

## Case No. 627.

### ATLANTIC INS. CO. v. CONARD.

[4 Wash. C. C. 662.][1]

Circuit Court, D. Pennsylvania. April Term, 1827.[2]

SHIPPING — RESPONDENTIA — AFTER COMMENCEMENT OF VOYAGE—USURY—CONTRACTS RELATING TO SAME SUBJECT-MATTER—PRE-EXISTING DEBT—EVIDENCE.

1. A respondentia bond, given to secure a loan made upon a certain voyage, is not void because it was given and the loan made after the vessel had sailed. The principles of law relative to this subject fully examined.

[Cited in Greeley v. Smith, Case No. 5,750.]
[See note at end of case.]

2. Where the voyage described in the respondentia bond, and the real voyage are or are not the same.

3. Where the loan is or is not chargeable with being usurious.

4. The words "lost or not lost" omitted in the respondentia bond may be supplied by other equivalent expressions, so as to place the money loaned at the risk of the lender.

5. A loan on respondentia "upon the goods, to the amount of the loan, laden or to be laden

on board the vessel, or which may be laden on board at any time during the voyage." Those words give to the lender a lien, and no more, on the homeward cargo, which cannot be opposed to the claim of preference of the United States, upon the estate of the borrower.
[See note at end of case.]

6. The respondentia bond, memorandum indorsed on it, and the outward bill of lading and assignment thereon, are all to be construed as one instrument for the purpose of discovering the intention of the parties, which when discovered must govern.
[See note at end of case.]
[As to the construction of different instruments relating to the same subject-matter, see Rutland & B. Ry. Co. v. Crocker, 29 Vt. 541; Gregory v. Marks, Case No. 5,-802; Livingston v. Story, 11 Pet. (36 U. S.) 386; Lamb v. Davenport, Case No. 8,015.]

7. The agreement so obtained from the construction of this instrument being that the outward and homeward cargoes should be a collateral security for the loan; that the outward bill of lading should be assigned to the lender for that purpose; and that the homeward should be to order, with a blank indorsement, vested in the lender an equitable interest which could not be defeated by the subsequent right of preference of the United States.
[See note at end of case.]

8. A right of one person to a chattel, and possession in another under a contract which does not entitle the former to the present possession, is no badge of fraud.
[See note at end of case.]

9. The delivery to the lender of money on respondentia of the homeward bill of lading, after the arrival of the vessel, was equivalent to a direct consignment to him, and converted his equitable into a legal interest.
[See note at end of case.]

10. A respondentia bond given on a cargo at the risk of the lender, to secure a pre-existing debt, is valid.
[See note at end of case.]

11. No fraud practiced by the borrower or his agents, not participated in by the lender, can affect the validity of the respondentia bond.

12. A letter from one of the general assignees of the borrower to the captain of his vessel, respecting the manifest of the homeward cargo, cannot be given in evidence against the plaintiff, the lender of the money on respondentia.

13. Where, in a suit by an incorporate body, proof of their incorporation may be dispensed with.

14. Questions asked of the witness by the defendant's counsel, and pronounced to be improper, as they related to the acts of the borrower and his agent, being proved to have been without the participation of the plaintiff the lender.

15. The court would not admit in evidence the correspondence between one of the obligors in the respondentia bond, and one of the directors of the insurance company, the plaintiff in the suit, and with the borrower, impeaching the respondentia bond.

[At law. Action of trespass by the Atlantic Insurance Company of New York against John Conard] the marshal of this district, for seizing certain teas imported into Philadelphia by Edward Thomson, in the ships Addison and Superior, under an execution at the suit of the United States against said Thomson; to which teas, the

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]
[2] [Affirmed by supreme court in Conard v. Atlantic Ins. Co., 1 Pet. (26 U. S.) 386.]

plaintiffs asserted a property in themselves. Under an arrangement made between the secretary of the treasury and the plaintiffs, these teas were given up to the plaintiffs, upon their giving bond and security to restore the same, in case the question as to the right of property in those teas should be decided against the plaintiffs in this action. This bond was accordingly executed under the corporate seal of the plaintiffs, and was accepted by the district attorney, and delivered over by him to the proper officer of the government. The following are the material facts attending this case: Edward Thomson of Philadelphia, being the owner of the ships, the Addison and Superior, despatched them on a voyage to Canton in the year 1825. The former sailed from Philadelphia on the 22d of April, and the latter, on the 6th of June of that year. The outward bill of lading of the Addison bears date the 21st of April 1825, and is for seven kegs containing three thousand Spanish dollars each, shipped by said Thomson for his account and risk, to be delivered at Canton to Mr. J. R. Thomson or assigns. The bill of lading of the Superior's outward cargo bears date the 6th of June 1825, and was for about thirteen thousand Spanish dollars shipped by said Thomson for his account and risk, to be delivered at Canton to J. R. Thomson. On the 21st of June 1825, the plaintiffs lent to E. Thomson the sum of $21,000 upon respondentia on the cargo of the Addison. They also lent to him $13,000, on the cargo of the Superior, on the 14th of July 1825. To avoid the necessity of further noticing the transaction in relation to this latter loan, it may be sufficient here to observe, that the only difference in the two transactions is, that the first loan was on specie on board of the Addison at the time she sailed, and the latter loan was in part payment of a former loan made by the plaintiffs to E. Thomson on another of his ships.

The respondentia bond on the cargo of the Addison, to secure the loan of the $21,000, bears date the 21st of June, and is in the names of Edward Thomson and three others. After reciting in the condition of this bond a loan this day made by the Atlantic Insurance Company to Edward Thomson of $21,000, upon the goods and specie to that amount laden, or to be laden, on board the Addison, or which may be laden on board at any time during the voyage on account of the said Edward Thomson; that the said intended voyage is to Canton, and back to Philadelphia; and that the plaintiffs take the hazard and adventure of the said sum so lent on said goods and specie, laden or to be laden on board the said vessel during the said voyage, so that it do not exceed twelve months from the 21st of April 1825: the condition is, that if the said ship, laden with said goods and specie, do, with all convenient speed, proceed on the said voyage and return to Philadelphia, having on board the above stipulated amount in value in specie or goods on the respective passages out and home, to end her voyage there by the end of the said twelve months, dangers of the seas excepted; and if the said obligors shall pay to the plaintiffs the said $21,000 immediately upon her arrival at Philadelphia, or upon the expiration of the said twelve months, together with the marine interest, amounting to $2205: or if the said obligors do, immediately on her said return, provided it happen within the said twelve months, give satisfactory security to pay to the plaintiffs the said principal sum and marine interest within three months from the time of said arrival, with lawful interest thereon from the time of such arrival, and shall pay the same accordingly at the end of the said three months; or if in the said voyage, and before the end of the said twelve months, the said goods, &c. shall be totally lost, and the obligors shall abandon, &c. to the plaintiffs, all said goods of said obligors so laden at Philadelphia, on board said ship, and all other goods which shall be acquired during said voyage by reason of, or from, the proceeds of the said goods, &c. and the net proceeds thereof, and account for and pay within four months from such loss, to the plaintiffs, any average they may obtain upon the same: then, &c. &c. Upon this bond is indorsed a memorandum, which recites the following agreement, viz. that the bills of lading for the goods, specie, &c. mentioned in the within bond, shall be indorsed to the plaintiffs as a collateral security for the within loan; that the property to be shipped homeward, as aforesaid, being the proceeds of the said loan, shall be for the account and risk of the borrowers, or some of them; and that the bills of lading therefor shall express the same, and shall also express that the said property shall be delivered to the order of the shippers; and that the same shall be indorsed in blank, and shall be placed in the hands of the plaintiffs, either before or on the arrival of the said ship at Philadelphia, to be held by them as a continuation of such collateral security; to the true performance of which agreement the parties bind themselves. The memorandum then proceeds: "now it is hereby declared, that such indorsement or consignment shall not exonerate the persons of the obligors, nor compel the plaintiffs to accept the goods, &c. which may arrive under such bill of lading and consignment, in discharge of said debt, but it shall be lawful for the plaintiffs to receive and hold said goods, &c. for ninety days after their arrival at Philadelphia, and if the principal debt, interest, and premium in said bond mentioned, be not paid within said time, to sell the same at public auction, and to charge the obligors with the balance, after deducting freight, duties, commissions, and other charges." The above memorandum is signed by all the obligors.

On the same day an assignment was in-

dorsed on the outward bill of lading, to the following effect, viz. "For value received, I do assign to the Atlantic Company the within bill of lading, and the specie, goods, &c. to be procured thereon or thereby, and any return cargo to be obtained by the within mentioned outward cargo and specie, or the proceeds thereof, and all the return cargo to be taken on board the within mentioned ship, by or for my account, as collateral security, according to an agreement executed and adjoined to a respondentia bond given by myself and, &c. (mentioning the names of the other obligors) dated the 21st of June 1825, for $21,000." Signed by E. Thomson. It was proved that the above sum of $21,000 was paid in two checks to F. H. Nicoll & Co. the said Nicoll being one of the obligors in the above respondentia bond. On the 29th of November 1825, E. Thomson became insolvent; and, on that day, made a general assignment of all his property for the benefit of his creditors, to Peter Mackie and Ruland Renshaw. The Addison left Canton in November 1825, with a bill of lading of the proceeds of the $21,000 consigned by Fisher, attorney for J. R. Thomson, to be delivered to —— or assigns. This bill of lading is indorsed in blank. The homeward invoice is of goods shipped by Fisher, attorney as aforesaid, on board the Addison, for Philadelphia, for account and risk of E. Thomson, and consigned to order, and indorsed blank by Fisher, attorney as aforesaid. Both of those papers bear date the 22d of November 1825. It also appeared, that Fisher delivered to the master of this vessel a manifest, stating the cargo to be consigned to E. Thomson.

The Superior brought a bill of lading of goods valued at $3393, consigned to Peter Mackie, and another, of goods valued at $1139, consigned to B. Arney. Before the arrival of these vessels at Philadelphia, the United States obtained judgment against E. Thomson, on certain custom house bonds, and on their arrival in Delaware Bay, an execution issued on the said judgment on the 13th of March 1826, and was levied on the cargoes of said vessels on the 15th of the same month. A day or two before the ships came up to Philadelphia, Mackie, one of the assignees of E. Thomson, delivered duplicates of the homeward invoice and bills of lading of the Addison's cargo to the plaintiffs' agent in Philadelphia, and, on her arrival, handed to him likewise those brought by the captain; and on the 22d of March, Mackie and Arney indorsed to the plaintiffs those which came to their order by the Superior. The reason assigned for there being a manifest and general bill of lading consigning the cargo to Thomson, was to enable him to enter it in his own name; after he had settled with the insurance offices, and paid the loans made by them.

For the plaintiffs it was contended, that the loan on the Addison was the common

case of money lent on respondentia, and an assignment of the bill of lading as collateral security; that the cargo was thereby pledged for the repayment of the principal, with marine interest; that the goods being at sea, and not actually deliverable, this assignment passed the title so as to give a specific lien; that their right was therefore good against any but a bona fide purchaser without notice; but that the United States did not thus claim; but merely as a preferred creditor, having no lien, but only a right to be paid first out of property of Thomson's, at the time of his general assignment; but as he could not have claimed this property without first paying off the incumbrance, neither could the United States. That as to the loan on the Superior, the fact of its being applied in payment of a former loan, made no difference.

For the United States, it was admitted that they gained no lien by Thompson's insolvency; they only claimed under the priority given by law; which vests, they contended, in all cases except where there was sale to a bona fide purchaser, mortgage, or execution executed. That neither of the two first was pretended by plaintiffs, and the third the United States had themselves. That the question was, whether, when the public priority attached, the property belonged to the plaintiffs. That it did not, was argued: 1. Because these were not valid respondentia bonds; and therefore gambling contracts, and void by the laws of New York: for these loans not being made till after the ships had sailed, the money could not be applied to the purposes of the voyage. Nor was it proved that Nicoll & Co. received the moneys for Thompson, and therefore the consideration failed. 2. That the contract was not bottomed on any real adventure; that the voyage and risk must be the same described in the bond; which was not the case here, for the bond refers to an intended voyage; whereas, the ship had already sailed, and no part of the cargo belonged to Nicoll and others, though they were mentioned in the bond. Besides, the return cargo is mentioned as the proceeds of the loan, which was impossible, the vessel having sailed two months before the money was lent. 3. That marine interest was charged without marine risk: for that there was no risk at Philadelphia, as stated, the vessel having previously left that port; and moreover, interest was charged from the date of the bill of lading, several weeks before the lending of the money; which was clearly usurious. 4. That only a lien was created, but there was no transfer of the property, and the public priority dislodges every lien not connected with the right of property. 5. That, at least, the plaintiffs gained no title to the return cargo, because it could not possibly be the proceeds of the loan, according to the terms of the assignment. 6. That the cargo left Canton the property of

Thomson, and that Mackie had no authority to transfer it, he being but a trustee for creditors; and lastly, that Thompson being the owner of the property when it arrived here, the sixty-second section of the revenue laws avoids all transfers before entry; and that the right of the United States attaches.

It was said, in reply, that this right of the government was only a priority of payment out of the debtor's estate. That if the property be out of the debtor, absolutely or conditionally, the priority is subject even to the conditional property in another. That the loans in this case were to be repaid on an event which has happened, and there was a lien and property in the goods, to secure repayment. That the fact of the loan was sufficiently proved; for, as Nicoll & Co. must have had Thomson's bond, to deliver to the company, that alone was sufficient authority to receive the money as his agents. That the bond itself, or taken together with the agreement, assignment, and delivery of the bill of lading, gave a lien and property; and that, as to the impossibility objected, of the goods homeward being the proceeds of the loan, the plain meaning of all the documents taken together, was to give a lien on the goods shipped by Thomson, and on the goods homeward, being the proceeds of the outward cargo; and that the delivery of the homeward bill by Mackie was the performance of this agreement. It was added, that no authority had been adduced to show that a loan on respondentia, after the voyage was begun, was void. That the risk was a real one, and that the voyage performed was, clearly, the one intended to be described in the bond. That the description of the risk as beginning at Philadelphia, was usual in all policies; and that, as the principal was at risk, this was no gambling contract. That the consignment to Thompson was correct; he was the general owner or importer; and that even if any fraud were thus intended on the revenue, the plaintiffs were ignorant of, and ought not to be affected by, it.

Cases cited by defendant's counsel: 1 Mass. 482; 1 Emer'ig. 366; 3 Johns. Cas. 66, 266; 2 Cow. 678; 8 Johns. 84; 8 Serg. & R. 138; Whart. Dig. 538, pl. 29; Parker, 470, 477; 3 Bl. Comm. 159; 1 Wils. 260; 2 Term. R. 587; [Hamilton v. Russel,] 1 Cranch, [5 U. S.] 316; 3 Camp. 92; 2 Holt, Shipp. 61; 1 Term. R. 205; Abb. Shipp. 173, 174, 176; 1 H. Bl. 359; [The St. Joze Indiano,] 1 Wheat. [14 U. S.] 208; 8 Cranch, 253, 328, 354; [The Venus, 8 Cranch, (12 U. S.) 253; The Merrimak, Id. 328; The Frances, Id. 354;] [The Frances,] 9 Cranch, [13 U. S.] 183; 2 Holt, 74; 1 Johns. 215; 3 Bior. & D. Laws, 158, § 23; 1 Term. R. 745; 1 Bos. & P. 563; 3 Camp. 92; 2 Bl. Comm. 457, 458; Parker, 410; 2 Marsh. 733, 747, note, 736, 737, 743, 738, 820; Busk v. Fearon, 4 East, 319; Parker, 25; 1 Marsh. 332; [Thelusson v. Smith,] 2 Wheat. [15 U. S.] 396; [Blaine v. The Charles Carter,] 4 Cranch, [8 U. S.] 332; 1 Holt, 424; 2 Holt, 68; 5 Taunt. 36.

Hopkinson & Binney for plaintiffs.

The Attorney General of the United States, Mr. Wirt, Dist. Atty., C. J. Ingersoll, and Mr. Randall, for defendant.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

WASHINGTON, Circuit Justice, charging jury. The single question to be decided is, had the plaintiffs such a property in the goods in question on the 19th of November, 1825, when Edward Thomson made a general assignment of all his effects for the benefit of his creditors, as protected the goods on which the execution, at the suit of the United States, was levied, against the preference of the United States which accrued on that day? If they had, they will be entitled to your verdict; otherwise, not. The plaintiffs' title to this property commences with the respondentia bonds on the cargoes of the Addison and Superior, which have been laid before the court and jury. The claim of the plaintiffs, resting entirely upon the validity of those bonds, and the papers connected with them; their validity has been denied by the defendant's counsel on the following grounds:

1. Because they were given for money lent by the plaintiffs after the ships had sailed; of course the money was not lent for the purpose of enabling the borrower to make the voyage, nor was the money lent ever at risk, not having been put on board in specie, nor a cargo which it contributed to procure. It is insisted, that this security, when given for a loan after the vessel has sailed, and the risk has begun, is inconsistent with the nature, character, and design of this species of security. Let it be admitted, for the sake of the argument, that, strictly and correctly speaking, a loan upon the security of a cargo already at sea, is not a loan upon respondentia; and that the design of those securities in their origin, was to enable the borrower to engage in the contemplated enterprise. It may further be admitted, that loans like the present are unlike the pecunia trajectitia of the Romans; from whom it is quite likely this species of security was derived. But how does it follow from these concessions that the security is invalid as a marine contract, in cases where the vessel has sailed before the loan is made? There is no case, nor is there even the dictum of any respectable jurist, to my knowledge, which pronounces it to be so. Marshall, in his second volume on Insurance, page 747, states it to be a question upon which Valin and Emerigon had differed, whether money may be lent on a ship or goods already exposed to the perils of the sea; and this learned writer expresses his own opinion to coincide with that of Valin, who holds the affirmative of the proposition. And even Emerigon does not allude to this subject in reference to any

general principle of maritime law; but speaks of the lien created by a respondentia bond, under those circumstances, according to certain articles of the ordinances of France. 1 Emerig. 136, 137, 157. Marshall, (volume 2, p. 738,) states what are the essential requisites of this species of marine contract, be its form what it may. It must contain, he observes, 1. The names of the lender and borrower. 2. The names of the ship and master. 3. The sum lent, and the marine interest. 4. The voyage proposed, and duration of the risk. And lastly, the subject on which the loan is made, whether goods or both.

If it could be made out that the contract is usurious or gambling, where the sailing of the vessel precedes the loan, there might then be weight in the objection; but there is no case, nor is there any writer, who has attempted to maintain this proposition. "It is," says Marshall, (volume 2, p. 742,) "of the essence of this contract, that the money lent, or something equivalent to it, be exposed to the perils of the sea, at the risk of the lender." "If the borrower have no effects on board, or he borrow much beyond their value, and agree to pay high marine interest, this affords a strong ground to suspect fraud, and that the voyage will have an unfavorable end." The true test of its being a gambling contract is, there being no goods on board to the value of the loan, and at the risk of the lender; as fully appears by the French ordinances, and by the English statute of 19 Geo. II. c. 37, to prevent gambling marine contracts. 2. Marsh. 743. These quotations are sufficient to show what is, and what is not a gambling marine contract. Is the loan usurious, if it be made subsequent to the sailing of the vessel? "The marine interest," says Marshall, (2 Marsh. 749,) "however high it may seem, cannot be deemed usurious if the money lent be bona fide at risk." "If indeed the form of a bottomry or respondentia loan to be used as a cloak to an usurious contract; that, no doubt, would be usurious and void." The same principle governs contracts made on land, and without reference to maritime enterprises; as is abundantly shown by the cases of Roberts v. Trenayne, Cro. Jac. 507, and Chesterfield v. Janssen, 1 Atk. 301. If then this contract stands clear of the objection of fraud, gambling, or usury, upon what other ground can it be avoided? Is it contrary to good policy? This has not been shown in argument, nor is it maintained by any elementary writer. If the lender need not see to the application of the money lent, which it is admitted by all he is not bound to do; what difference can there be in sound reason between a loan made after the departure of the vessel and one made before; when, in the latter case, the borrower is at liberty to dispose of the money borrowed in payment of his debts, or in any other way he may think proper, without having employed one cent of it in the purchase of the cargo, on which the loan is made? The truth is, that in many instances, a loan made after the risk has commenced, and on the anticipated capacity which it will give to the borrower to pay for the cargo at risk, and purchased on credit, may be as beneficial to commerce, as if, in the strictest sense of the Roman law, it were pecunia trajectitia; as if the identical money lent, or goods purchased with it, had been put on board, and at the risk of the lender.

2. This contract is asserted to be invalid, because it is not founded on a real transaction; not on the precise voyage and cargo mentioned in it. The voyage described is at and from Philadelphia to Canton, and back to Philadelphia; and she is "to proceed and sail on said voyage;" which expressions plainly describe as well a voyage in progress as one which had not then commenced. There is no expression in the instrument which represents the vessel to be then in port, or that the voyage was to commence on or after the 21st of June. The voyage described then, and the real voyage were the same. As to the cargo, the loan is made on the goods laden, or to be laden, or which at any time during the voyage might be laden. It is in vain to contend that these expressions do not accurately describe the property mentioned in the outward bill of lading, as well as the proceeds of it in the homeward bill of lading.

3. The charge of usury is reiterated against this contract, because the marine interest, it is said, is allowed upon the loan from the sailing of the vessel, and consequently for about two months before any real risk was assumed by the lenders. The cargo was known to be safe at the time of the departure of the vessel. It is true, the property was not at the risk of the lenders until this contract was entered into. But the effect of it was to place it in that predicament, by an express stipulation, whilst the vessel was at Philadelphia, and from the instant of her departure. What influence her known safety at these periods had in diminishing the marine interest can only be conjectured; but it is certainly no objection to the contract, upon the ground of usury, that the property was known to be in safety at any particular period of the assumed risk by the lender. The real question for the decision of the jury is, whether, under all the circumstances of the case, the loan was bottomed upon a fair marine contract, the repayment of which was to depend upon the perils which the lender assumed to bear; or whether the contract was merely a device to cover an usurious loan? If the risk be inconsiderable, and for a small part only of the voyage, and the interest be high, these circumstances may justify a presumption of unfair or illegal conduct, sufficient to avoid the contract. But the mere circumstance of the known safety of the cargo at any particular period of the

voyage, or of the assumed risk, is not, per se, an objection to the contract on the ground of usury.

If Edward Thomson was to pay interest from a period antecedent to the loan, and this was the sum covered by the respondentia, there can be no question but that the contract was usurious; and it would be so, although the legal rate of interest only be reserved. How the fact is in relation to this point I know not, but leave it for the decision of the jury upon the evidence which has been laid before them. Some papers and parol evidence upon this part of the case were laid before the jury, from which they will draw their own conclusions. I allude to the papers annexed to Mr. Gracie's affidavit. Another reason assigned by the defendant's counsel why this loan was not at the risk of the lender during the whole voyage is, that the words "lost or not lost" not being inserted in the bond, if the vessel had been actually lost at the time this contract was entered into, the loss would not have been at the risk of the plaintiffs. The answer given to this position by the plaintiffs' counsel is conclusive. The words in the bond "if in the said voyage there be loss" are precisely equivalent to the expressions "lost or not lost" in ordinary policies of insurance. If this contract has been relieved from the objections which have been urged against its validity, the next inquiry is, what title to the property in question did it confer upon the plaintiffs?

There is no doubt that it gave a lien on the homeward cargo, being the produce of that on which the loan was made, but it conferred no other right. The loan is stipulated by the bond to be made upon the goods to the amount of the loan, laden, or to be laden on board the vessel, or which may be laden on board at any time during the voyage, on account of Edward Thomson. These latter expressions, which were not inserted in the bond in the case of U. S. v. Delaware Ins. Co., decided by this court, October, 1823, [Case No. 14,942,] operate to the extent mentioned. And if this case turned solely upon the right of the plaintiffs to a lien, it would present the question whether such a right could be opposed to the right of preference vested by law in the United States, which would seem to be decided by the case of Thelusson v. Smith, [2 Wheat. (15 U. S.) 396.] Our inquiries, therefore, must be extended to the memorandum and outward bill of lading, and the indorsement thereon; to see whether they apply to, and include the homeward cargo, and if they do, what influence they have on the plaintiffs' rights. There is no doubt but that those instruments, together with the respondentia bond, are to be construed and treated as if they all constituted one instrument. Considering them then in this light, the question is, whether they cover that part of the homeward cargo which was the investment of the outward

cargo on which the loan was secured. The difficulty in solving the question arises from the expressions in the memorandum, "being the proceeds of the said loan." Now, the argument is, that since the loan was made after the departure of the vessel, the return cargo was not, and could not possibly be the proceeds of that loan; and consequently the memorandum could vest in the plaintiffs no right of any kind to the homeward cargo.

I must acknowledge that I was at first much struck by this objection. But it loses much, if not the whole of its weight, when those words in the memorandum are construed in connection with other parts of the same instrument, as well as with the other instruments of which it is only a part. Our object should be to discover from those papers what was the intention of the parties, and when this is accomplished, we must give effect to it. If there be an incongruity in one part of an instrument, it may be explained by others, so as to enable the court to give a consistent construction of the whole. Now, it appears by the condition of the bond that the loan was made on the 21st of June, after the Addison had sailed, and that it was made on the goods and specie laden, or to be laden, then or at any time during the voyage. The outward bill of lading, referred to in the memorandum, which was agreed to be indorsed to the plaintiffs as a collateral security for the loan, bears date the 21st of April, two months prior to the loan, and the assignment indorsed on that paper is of the bill itself, and of the specie, goods, &c. to be procured thereon or thereby, and any return cargo to be obtained by the outward cargo and specie mentioned therein, or the proceeds thereof; and all the return cargo to be taken on board the said ship, by or for the account of Edward Thomson, as collateral security, according to an agreement duly executed and adjoined to a respondentia bond, given, &c. Now there is no ambiguity in this assignment, which most clearly refers to a homeward cargo, the proceeds, not, as in the memorandum, of the loan, but of the outward cargo mentioned in the bill of lading. Since then, the homeward cargo might be the proceeds of the outward cargo, and could not possibly be so of the loan, those expressions in the memorandum ought to be construed to mean "the proceeds of the outward cargo on which the loan was made," in order to give effect to the obvious intention of the parties, and ut res magis valeat quam pereat. This difficulty being removed, the next question is, what was the nature and effect of the contract between the plaintiffs and Thomson, upon the above instruments taken together? The obvious answer is, that the bond, as has been before stated, created a lien on the homeward cargo and no more. But the memorandum and assignment on the bill of lading amount to an agreement. 1. That

the outward and homeward cargoes should be a collateral security for the loan. 2. That the outward bill of lading should be assigned to the plaintiffs for that purpose. And lastly, that the homeward bills of lading should be to order, with blank indorsements, and should be delivered to the plaintiffs as a security for the loan. The legal operation of this agreement was unquestionably to vest in the plaintiffs, an equitable title to the property in question, being the proceeds of the outward cargo. Edward Thomson, for whose account, and at whose risk the homeward cargo was to be shipped, and who had the sole management and possession of the property, was, for this purpose, a trustee for the plaintiffs; and nothing remained to be done, in order to vest in the plaintiffs the legal right to this property, but the delivery of the homeward bills of lading to order with a blank indorsement thereon. This delivery took place upon the return of those vessels, which perfected the plaintiffs' title to the property But it is contended that there was no consideration given for this security, the debt for which it was given being merely contingent. But surely $21,000, which were paid to Edward Thomson, must be considered as a very substantial consideration; and although the repayment was to depend upon a contingency, no sufficient reason has been assigned, why a valid security may not be legally taken for a contingent debt.

What then were the relative rights of the plaintiffs and of the United States, on the 19th of November, 1825, when the right of preference accrued to the latter by the insolvency of Edward Thomson? The answer is, that the former had an equitable title to the homeward cargo, and a right, by their agreement with Thomson, to call upon him for the legal interest, by delivering to them the bills of lading of that cargo. If this delivery had actually been made before the above period, as happened in the case of U. S. v. Delaware Ins. Co., [Case No. 14,942,] no question, as I apprehend, could exist, as to the superior title of the plaintiffs over the right of preference of the United States, upon the principles decided in the case of Thelusson v. Smith, 2 Wheat. [15 U. S.] 396. But do not the principles of that case apply as well to one where the equitable title has been parted with by the insolvent, as where the legal title has been? The right of property, was, by the agreement, divested out of Thomson, and vested in the plaintiffs, so as to leave the former a bare trustee to deliver over the evidences of the legal title to the latter. The great principle laid down in the case above referred to is, that the privilege of the United States to be first paid their debt is confined to a satisfaction out of the property of the insolvent. But surely it cannot be said that a trustee has any property in the subject matter of his trust.

Equity considers the cestui que trust as the exclusive owner of the property. In this, as well as in some other respects, this case differs from that of U. S. v. Delaware Ins. Co., [supra.] In that, the legal title was in the lender before the insolvency of the debtor of the United States. In this, the equitable title only had been parted with. In that, the actual possession of the master was constructively the possession of the lender upon respondentia; in this, the possession was in Edward Thomson, but there it was the possession of a trustee, and a sale of the property by him to a third person without notice would have prevailed against the title of the plaintiffs. But in this, the delivery of the homeward bills of lading to the plaintiffs in pursuance of the agreement, no matter by whom, perfected their legal title. No creditor whatever, intervening before the agreement was specifically executed, can prevail against the plaintiffs.

It was asked by the defendant's counsel, how it was possible that an absolute right of property could co-exist in two persons? To which I feel no hesitation in answering, that it cannot, if the right of both be of the same nature. But an absolute legal right of property may exist in one person, and an absolute equitable right in another, at the same time; and the possession need be only in the trustee or legal owner. Again, it has been insisted, that where the property is in one person the possession being permitted to remain with another, is a fraud as well in respect to creditors as to purchasers. I admit the rule, that an absolute transfer of a chattel is fraudulent against creditors, unless possession accompanies and follows the deed. The reason is, that the separation of the possession from the title is incompatible with such a transfer. But if the sale or transfer is on a condition, or on trust as a security for a debt, or for any purpose which does not entitle the vendee to the immediate possession; the possession of the vendor until the said condition is performed, or the objects of the trust are fulfilled, is consistent with the transfer or deed, and is therefore no badge of fraud. This is precisely the present case.

It has been asked by the defendant's counsel, whether the plaintiffs could have insisted upon the possession of these goods at Canton, or at any other time or place previous to the insolvency of Edward Thomson? I answer that they certainly could not, because, by their agreement with Edward Thomson, he was to have the cargo brought to Philadelphia, and was there to deliver to the plaintiffs the muniments of title. But after the arrival of the cargo, the plaintiffs were at liberty to take possession of the property, or to recover it by suit, subject only to the claim of the United States for the duties on the same.

Much has been said at the bar, as to the real design and intention of the parties to this contract; as to which I would observe, that their intention can best be discovered from their agreement, all of which is in writing; and from their acts. That a loan was made; that it was at the risk of the lenders, on a real cargo to its value on board, and on a real voyage, and was intended to be secured by an outward and homeward bill of lading, the latter to be to order, and to be delivered with a blank indorsement to the plaintiffs, is perfectly manifest. Why it was agreed to be to order, and to be indorsed in blank, we know not. But this is clear, that the delivery of the homeward bill of lading to the plaintiffs, was equivalent to a direct consignment to the plaintiffs.

The last subject to be noticed is the loan on the cargo of the Superior. The only differences between this loan, and that on the cargo of the Addison, are, 1. That in this, the sum secured by the respondentia bond, and accompanying papers, was for a pre-existing debt, and not for money actually lent at the time. And 2. That in this case, the homeward bills of lading were filled up to Peter Mackie and Barclay Arny. As to the first difference, it is immaterial; if the principles already laid down in relation to the security on the cargo of the Addison be correct. If the lender is not bound to see to the application of the money lent, and if a valid security may be given on the cargo in a case where the loan is made after the departure of the vessel, it cannot be material whether the security be given for money actually lent and advanced at the time, or for a debt previously due; provided the essential requisites to constitute a valid respondentia contract, which have already been noticed, exist in both cases. As to the second matter of difference, there can be no doubt but that the filling up the bills of lading in the manner these are, was a violation of the agreement between the plaintiffs and Thomson, which was precisely the same with that which was made in relation to the cargoes of the Addison. But can this affect the right of the plaintiffs? If Edward Thomson, or his agent at Canton, thought proper to depart from the terms of his agreement with the plaintiffs as to the form of the homeward bills of lading, this cannot prevent the latter from opposing their equitable title to this property to the preference claimed by the United States. Mackie and Arny had no real title to those goods, and claimed none. They received the bills of lading as trustees for the plaintiffs; and as such, they assigned them to the plaintiffs.

As to the question whether the return cargoes of these vessels are the proceeds of the outer cargoes, you must decide upon the evidence which has been given to you. As to the charge of fraud, which it is insisted by the defendant's counsel taints this transaction throughout, I leave that for your decision, after an impartial and attentive consideration of the whole of the evidence. All that my duty requires of me is to state those legal principles which should accompany your inquiries upon that subject. These are, 1. That actual fraud must be proved, and ought never to be presumed. And 2. That no fraud which may have been practiced or attempted, by Edward Thomson, his captains or agents, can affect the validity of these contracts: unless it has been proved that the plaintiffs, in some way or other, have participated in it.

The jury found a verdict for the plaintiffs.

During the trial of this cause, the following points arose, and were ruled upon objections taken to evidence.

1. An objection was made by the plaintiffs' counsel to the admissibility of a letter from one of Edward Thomson's general assignees to the captain of the Addison, directing him to make his manifest to conform to the bill of lading.

WASHINGTON, Circuit Justice. This objection is made by the counsel, as they allege, for the sake of the principle involved in it, rather than on account of any importance which they attach to the particular paper offered in evidence. This cause turns upon a question of property, which the plaintiffs affirm and must maintain to be in them.

(After stating the plaintiffs' title as before set forth in the charge, the judge proceeded as follows:) The United States claim no right of lien to the goods in question, but claim as creditors of Edward Thomson, and as preferred creditors. They assert that the title to these goods was in Edward Thomson at the time their execution was levied on them. The question upon these facts then is, can the United States, or could Edward Thomson or his assignees, if they were now the defendants, set up his or their orders, or his or their acts, or those of their agents, fraudulent or otherwise; the plaintiffs not having participated in them, to defeat, or in any manner to affect the prior title of the plaintiffs, assumed for the present to have been fairly acquired. We feel no hesitation in giving a negative to this question. The evidence offered, is not to explain the original contract as in the case of Hibbert v. Carter, [1 Term R. 745.] Nor is it offered to taint that contract with fraud. It is not offered even to affect the homeward bills of lading and invoice, for they are in strict conformity with the contracts, except in the part as to the consignment of the cargo of the Superior. It merely respects the alteration of the manifest, so as to make it correspond with the bill of lading and invoice. But if the evidence were

applicable to the bills of lading, it would be improper to admit it to affect the plaintiffs' title, unless their participation were first proved. The evidence is rejected.

2. An objection was made by the defendant's counsel to the reading of the respondentia bond, until the plaintiffs should prove themselves to be a corporate body, by giving in evidence the act of their incorporation.

WASHINGTON, Circuit Justice. The written agreement of the real parties to this cause to try a particular question, viz. the right of property in these goods on the 19th of November 1825, and the acceptance by the district attorney of the plaintiffs' bond, executed under their corporate seal, to restore the property in case of a decision of that point against them, amount to an acknowledgement of the corporate capacity of the plaintiffs, and to a waiver of the usual evidence to prove that fact. Overruled.

3. To the following question by the defendant's counsel to Hidelius, the captain of the Addison, and now under examination, "did Mackie and Nicoll make out a new manifest, altering the destination of the Addison, and direct you to enter by it as the true manifest?" an objection was made and sustained by the court, upon the principle before laid down upon the first objection.

4. Similar objections were made to the following questions, asked by the defendant's counsel of the same witness, viz. "did you see Mackie pay money to the pilot for being the first to board the Addison?" "Whether part of a letter from Mackie to the witness was drafted by C. J. Ingersoll, signed by Edward Thomson, and countersigned by his assignees." The objections to these questions were sustained by the court.

5. The following questions put to Arny, another of the witnesses, by the defendant's counsel, were also objected to. "Do you know how the moneys lent by the plaintiffs on the cargoes of the Addison and Superior were applied by Edward Thomson?" "What did Edward Thomson do with the general homeward bill of lading by the Addison?" "Was the transaction with the plaintiffs in respect to the Scattergood (another vessel of Edward Thomson's, on the cargo of which security by respondentia had been given for other loans to him) negotiated in the same manner as that of the Addison?" The objections were all sustained upon the principles before laid down.

6. A question asked of Jones, another witness, by the plaintiffs' counsel, "whether Edward H. Nicoll, (one of the obligors in these bonds, and one of the directors in the Atlantic Insurance Company) ever took any part in the affairs of the company as a director?" was objected to, and the objection overruled.

7. The court refused to let the defendant's counsel give in evidence the correspondence between Edward H. Nicoll and Edward Thomson, respecting these bonds; as the plaintiffs ought not to be affected by it.

[NOTE. The judgment in this case was affirmed by the supreme court on practically the same points in Conard v. Atlantic Ins. Co., 1 Pet. (26 U. S.) 386; and, in delivering the opinion of that court, Mr. Justice Story said: ["The loan on the shipment in the Superior differs from that on the shipment in the Addison only in the circumstance that it was applied in discharge of a prior loan. In our judgment, that makes no difference as to the legal rights of the parties. * * * ["So far as the questions of usury or gaming or bona fides upon substantial risks are matters of fact, they were left fully open, and have been passed upon by the jury, who have found a verdict against them; so far as there are matters of law, apparent upon the record, proper to avoid the bonds, they are still open for inquiry. Two grounds have been relied on for this purpose: First, that the loans were made after the sailing of the ships on the voyage; and, second, that the money loaned was not appropriated to the purchase of the goods put on board, and was not the identical property on which the risk was run. In our judgment, neither of these objections can be sustained. * * * It matters not at what time the loan is made, nor upon what goods the risk is taken. If the risk of the voyage be substantially and really taken; if the transaction be not a device to cover usury, gaming, or fraud; if the advance be in good faith, for a maritime premium,— it is no objection to it that it was made after the voyage was commenced, nor that the money was appropriated to purposes wholly unconnected with the voyage. * * * ["It is contended on behalf of the United States that the priority thus created by law, if it be not of itself a lien, is still superior to any lien, and even to an actual mortgage, on the personal property of the debtor. * * * It is true that, in discussions in courts of equity, a mortgage is sometimes called a 'lien for a debt.' And so it certainly is, and something more; it is a transfer of the property itself, as security for the debt. * * * It does not consider the estate of the mortgagee as defeated and reduced to a mere lien, but it treats it as a trust estate, and, according to the intention of the parties, as a qualified estate and security. When the debt is discharged, there is a resulting trust for the mortgagor. It is therefore only in a loose and general sense that it is sometimes called a 'lien,' and then only by way of contrast to an estate absolute and indefeasible. But it has never yet been decided by this court that the priority of the United States will divest a specific lien attached to a thing, whether it be accompanied by possession or not. * * * ["The attention of the court will then be at once addressed to the question, what was the nature and extent of the interest of the insurance company in the shipments in question? The whole instruments must be taken together, and construed as one entire agreement. We must then examine the memorandum, the outward bill of lading, and assignments thereon, in connection with the bond. The bill of lading purports, on its face, to be a shipment by Edward Thomson of seven kegs, containing $21,000, for account and risk of the shipper; to be delivered at Canton to John R. Thomson, or his assigns. By the well-settled principles of the commercial law, the consignee is thus constituted the authorized agent of the owner, whoever he may be, to receive the goods; and by his indorsements of the bill of lading to a bona fide purchaser, for a valuable consideration, without notice of any adverse interests, the latter becomes, as against all the world, the owner of the goods. This is the result of the

principle that bills of lading are transferable by indorsement, and thus may pass the property. It matters not whether the consignee, in such case, be the buyer of the goods or the factor or agent of the owner. His transfer, in such a case is equally capable of divesting the property of the owner, and vesting it in the indorsee of the bill of lading. And, strictly speaking, no person but such consignee can, by an indorsement of the bill of lading, pass the legal title to the goods. But if the shipper be the owner, and the shipment be on his own account and risk, although he may not pass the title by virtue of mere indorsement of the bill of lading, unless he be the consignee, or, what is the same thing, it be deliverable to his order, yet, by any assignment, either on the bill of lading or by a separate instrument, he can pass the legal title to the same; and it will be good against all persons, except such a purchaser for a valuable consideration, by an indorsement of the bill of lading itself. Such an assignment not only passes the legal title as against his agents and factors, but also against his creditors, in favor of the assignee. In the present case Edward Thomson was the owner of the goods, and the consignee was merely his factor. He therefore had full power, notwithstanding the consignment, to pass the title to the property in the bill of lading, by a suitable instrument of assignment and sale against anybody but a purchaser without notice from his consignee, without any actual delivery of the goods themselves if they were then at sea, and incapable of manual tradition. The question then is whether the indorsement upon this bill of lading constitutes such an instrument. We are of opinion that it does. It purports to be a transfer in presenti, and uses the appropriate phrases of grant. * * * There was a valuable consideration for it; and, as Edward Thomson was the legal owner of the goods, the words 'assign and transfer' are sufficient words of grant to pass his legal title to the same. * * * The obvious intention of the parties was to give a specific interest in the goods shipped, so as to make them secure against the claims of creditors; and to construe the instruments to create no more than a lien, liable to be defeated by the acts of either party, or to be overreached by any privileged creditors, would be, not to follow, but to frustrate, their intention. * * *

["It is said that this debt upon a respondentia bond is of too contingent a nature to uphold a mortgage as collateral security for the payment of it. We know of no principle or decision that justifies such a conclusion. Mortgages may as well be given to secure future advances and contingent debts as those which already exist, and are certain and due. The only question that properly arises in such cases is the bona fides of the transaction. Then, again, it is said that the papers here disclose a transaction fraudulent in its own nature. But we are of opinion that there is no necessary implication of law on the face of these papers, which stamps it fraudulent. For aught that appears, the agreement may have been entered into with the most sincere and scrupulous good faith, and whether fraudulent or not, in fact, was a question for the jury, upon the whole evidence, which was properly left to their consideration; and they have, by their verdict, negatived the fraud. * * *

["But the main object relied on, and which, indeed, constitutes one of the exceptions to the opinion of the circuit court, is that possession of the return shipment was not obtained until after the levy by the United States; and it is contended that the want of such possession is per se a badge of fraud. The circuit court on this point decided 'that the actual possession of the above return cargoes, by the masters of the Superior and Addision, until levied upon by execution at the suit of U. S. v. Thomson, 1 Pet. (26 U. S.) 388, is not per se, in law, a badge of fraud, which ought to invalidate or affect the

title of the plaintiffs to these cargoes.' It appears to us that this decision is entirely correct in point of law, under the circumstances of the case. * * *"

[The rulings of the trial court on the objections, taken to evidence and questions were sustained by the supreme court on substantially the same grounds as given by the trial court.

[See, also, Conard v. Nicoll, 4 Pet. (29 U. S.) 291.]